IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 16, 2005

## STATE OF TENNESSEE v. MARLON ORLANDO WALLS

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40025A      Robert W. Wedemeyer, Judge**

─────────────

**No. M2003-01854-CCA-R3-CD - Filed Janaury 19, 2006**

─────────────

Defendant, Marlon Orlando Walls, was indicted on one count of first degree felony murder, one count of especially aggravated kidnapping, and one count of second degree murder. Following a jury trial, Defendant was convicted of first degree felony murder and especially aggravated kidnapping, and found not guilty of second degree murder. Defendant was sentenced to life imprisonment for the felony murder conviction and fifteen years for the especially aggravated kidnapping conviction. The trial court ordered Defendant's sentences to be served concurrently, and Defendant does not challenge the length or manner of service of his sentences. Defendant was granted a delayed appeal. In his appeal, Defendant argues (1) that the evidence is insufficient to support his convictions; (2) that the trial court erred in failing to instruct the jury on facilitation; (3) that the trial court erred in not declaring a mistrial; (4) that the trial court erred in failing to instruct the jury on the natural and probable consequences rule; and (5) that the trial court erred in not allowing into evidence proof that when the victim possessed the handgun, the victim was violating the terms/conditions of his community corrections sentence. After a thorough review of the record, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Roger Eric Nell, District Public Defender; and Russell A. Church, Assistant Public Defender, Clarksville, Tennessee, for the appellant Marlon Orlando Walls.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Trial**

Veronica Jenkins, Kenneth Montgomery, Katina Webb, and Thurman Webb were sitting on Ms. Jenkins' front steps in Lincoln Homes on July 29, 1997. As the group talked, Ms. Jenkins noticed that the victim, James McClure, was standing outside Mr. Montgomery's house across the street.

Defendant had told Ms. Jenkins earlier that day that the victim had broken into Reggie Lyle's automobile the night before. Ms. Jenkins said that she saw the victim walk toward Defendant and tell him "to come here." The victim was carrying a box with a gun in it. Ms. Jenkins said that Defendant did not appear to be upset or angry. Ms. Jenkins turned around and resumed her conversation with Ms. Webb. She heard a noise and looked toward the men. Ms. Jenkins saw David Marshall holding the victim by his collar with a pistol to the victim's neck. Defendant also had a gun and was walking back and forth on the sidewalk. Ms. Jenkins said that Mr. Marshall asked the victim about "robbing" Vince Steele, and then the three men started walking toward the back of the apartment complex. (All of the witnesses referred to each of the victim's alleged offenses generally as a "robbery" when, in fact, the allegations concerned the attempted burglary of Mr. Steele's house and the burglary of Mr. Lyle's car.) The victim walked in front of Mr. Marshall who kept his hand on the victim's shirt, and Defendant followed behind the two men. Ms. Jenkins said she saw Defendant a short time later, and he told her, "I just shot that n___ with his own gun." Ms. Jenkins said Defendant was upset, but he was not crying. Ms. Jenkins said that she did not hear the victim threaten either Mr. Marshall or Defendant.

On cross-examination, Ms. Jenkins said that Defendant did not point his gun at the victim as the three men walked away.

Ms. Webb testified that she, too, heard a noise. When she looked up, she saw Mr. Marshall strike the victim with a pistol. Ms. Webb said that Mr. Marshall asked the victim about a "robbery," and the victim kept saying, "No, man, no." Each time the victim said "no," Mr. Marshall hit him. Defendant was standing next to the two men and did not say anything during the altercation. Ms. Webb said that Defendant reached toward the victim's waistline and pulled out a gun. Ms. Webb said that the three men left, with the victim walking in front of Mr. Marshall who had his hand on the victim's shirt, and Defendant following in the rear. Ms. Webb said that Defendant did not appear upset, but he was "acting spaced out," which Ms. Webb described as "being in one place just staring at one thing." Other than looking tired and spacy, however, Ms. Webb did not notice any signs that Defendant had used drugs that day.

Mr. Montgomery testified that he went over to the victim's house around 1:00 p.m. on July 29, 1997. The two men talked for a few minutes, and then he and the victim drove to Mr. Montgomery's house in Lincoln Homes at approximately 1:15 p.m. Mr. Montgomery left his house to talk to Ms. Jenkins, and he told the victim to stay inside because of the rumors going around about

a "robbery" in which the victim had supposedly participated. Mr. Montgomery said that the victim denied breaking into Reggie Lyle's car and was upset with Defendant for telling people that he had committed the offense.

The victim came out of Mr. Montgomery's house about ten minutes later carrying a square box. Mr. Montgomery said that the victim walked up to Defendant and told Defendant that Defendant had lied about the victim's involvement in the "robbery." Mr. Montgomery said that Defendant did not respond to the victim's accusation. Mr. Marshall walked up behind the victim at that point. He put a gun to the victim's head and told Defendant to take the victim's gun. Mr. Marshall hit the victim with his gun two or three times. Mr. Montgomery said that he started to approach the men, but Mr. Marshall pointed his gun at him and told Mr. Montgomery to go back across the street. Mr. Montgomery said that Mr. Marshall told the victim, "Now we're going to get this straight." The three men walked away, and Mr. Montgomery followed them at a short distance.

The men arrived at Mr. Steele's residence and went into the backyard. Mr. Montgomery stayed on the street. He saw Mr. Steele drive up, and Mr. Montgomery went back to his house. He saw Defendant and Mr. Marshall about thirty-five or forty minutes later. Mr. Montgomery said that Mr. Marshall told him, "You better go get your boy." Mr. Montgomery returned to Mr. Steele's house and found the victim laying on the ground.

Mr. Montgomery said that Defendant did not appear upset during the incident, and never told Mr. Marshall that he did not want to go with Mr. Marshall and the victim to Mr. Steele's house. He said that he had never seen Defendant carry a gun before.

Cleotis Sothall was visiting his sister in Lincoln Homes. He joined the group of people who had gathered in front of Mr. Steele's house when Mr. Marshall, Defendant, and the victim arrived. Mr. Sothall said that he followed the men into Mr. Steele's backyard. Mr. Marshall told him to leave because they did not need any witnesses, and he left. Mr. Sothall said that Defendant was holding a gun.

Mr. Steele testified that he lived with his sister at her house in Lincoln Homes. He said that Defendant came over about 8:00 or 9:00 a.m. on July 29, 1997, and told Mr. Steele that the victim and LaBryant King had tried to break into his house the night before. Mr. Steele left for the day and arrived back home around 4:05 p.m. Defendant told him to come into the backyard because he and Mr. Marshall had one of the men who had tried to "rob" him. Mr. Steele said that the victim was sitting on the back stoop. Mr. Steele asked the victim if he thought the situation was funny. The victim did not respond, and Mr. Steele hit him.

Mr. Steele said that the victim was unarmed and kept looking at Defendant who was standing about three feet away. Defendant did not appear angry. Mr. Steele said that Defendant pulled out his gun and shot the victim three or four times. Mr. Steele said that he knew Defendant had used drugs that day, but he did not appear to be affected by the drugs.

Detective Timothy W. Saunders with the Clarksville Police Department found four 9 mm shell casings and one 9 mm live bullet at the crime scene.

Dr. Charles Harlan performed an autopsy on the victim and testified that the victim died of multiple gunshot wounds. The victim had two gunshot wounds in his upper left thigh, and two gunshot wounds to the small of his back. The bullets that entered the victim's back injured the victim's liver and right common iliac artery causing the victim to bleed to death. Dr. Harlan said that death would have occurred within five to twenty minutes after being shot, and the victim would have been unconscious for the majority of that time. The victim would have gone into shock prior to death, and the decreased flow of blood to the victim's brain would have caused confusion. Dr. Harlan said that the victim also had a laceration on the right side of his forehead.

On cross-examination, Dr. Harlan said that a drug screen did not reveal the presence of any cocaine in the victim's body, and only a low level of ethyl alcohol. Based on the absence of stippling around the wounds, Dr. Harlan said that the shooter was standing more than two feet away from the victim.

David Marshall testified that he and Defendant were close friends. Mr. Marshall said that around 12:00 p.m. on July 29, 1997, Defendant was standing near Ms. Jenkins' house. Mr. Marshall said that the victim walked past him and told Defendant to come to him. Mr. Marshall said that the victim had a gun in a box which he was holding behind his back. The victim asked Defendant why he had lied about the victim's involvement in the "robbery." The victim started to draw his weapon, and Mr. Marshall placed his gun against the victim's head. Defendant took the victim's gun. Mr. Marshall said that he struck the victim three times in the head with his gun, and asked the victim why he wanted to "rob" Mr. Steele.

Mr. Marshall said that the three men walked to Mr. Steele's house, and he held the victim by the arm as they walked. A crowd began to gather, so the three men went into Mr. Steele's backyard to wait for Mr. Steele to get home. The victim sat on the back stoop, Mr. Marshall stood in front of him, and Defendant stood by a tree. Mr. Marshall said that if the victim had tried to leave, he "probably would have beat him up if . . . it had came [sic] down to it."

Mr. Marshall said that Mr. Steele arrived at the house twenty or thirty minutes later. Mr. Steele walked up to the victim and started hitting him with a gun. Mr. Marshall said that the victim told Defendant that he was going to get him. Defendant walked over and shot the victim four or five times, and then left.

Mr. Marshall said that Defendant had not slept in two or three days, but that he appeared to know what was going on.

On cross-examination, Mr. Marshall said that he had been charged with especially aggravated kidnapping and felony murder as a result of his role in the incident, but that he entered a plea of guilty to the lesser offenses of aggravated assault and kidnapping. Mr. Marshall said that Defendant

had been addicted to crack cocaine for about ten years. Mr. Marshall was aware that Defendant had not slept for two or three days before the shooting because he was smoking crack cocaine.

Mr. Marshall said that Defendant asked Mr. Marshall for a gun when Defendant came to his house before the confrontation with the victim. Defendant told Mr. Marshall that "they" were going to come get him. Mr. Marshall said he thought it was just "the drugs talking," and did not think Defendant was referring to the victim. However, Mr. Marshall retrieved his gun "just to be on the safe side" before he and Defendant left his house.

Mr. Marshall said that Defendant was scared and "whining" when the victim called him over. Mr. Marshall said that it was the victim's idea to go to Mr. Steele's house in order to clear up the rumors. Mr. Marshall said he put his gun away, and the victim voluntarily accompanied him and Defendant to Mr. Steele's house. Mr. Marshall said that Defendant did not appear upset at that point. Mr. Marshall said that Defendant had been smoking crack cocaine and marijuana before they saw the victim.

Mr. Marshall said that while they waited for Mr. Steele, the victim admitted that he had participated in breaking into Mr. Lyle's car the night before, and that LaBryant King and Brian Meriwether were with him. The victim identified Mr. King and Mr. Meriwether, however, as the ones who had planned to break into Mr. Steele's house.

On redirect examination, Mr. Marshall conceded that the victim was not free to leave Mr. Steele's back yard. Mr. Marshall agreed that he was afraid the victim would return with a gun if he were released. Mr. Marshall said that Defendant did not have to follow them to Mr. Steele's house. However, Mr. Marshall said that he believed Defendant would have helped him restrain the victim if the victim had attempted to flee, and he agreed that he felt "like [he and Defendant] were in this together."

Officer Brad Crowe with the Clarksville Police Department said that he attempted to talk to the victim before the ambulance arrived. The victim was cold and ashen, and he kept slipping in and out of consciousness. The victim, however, was able to tell Officer Crowe that he had been kidnapped. Officer Crowe asked him who had kidnapped him, and the victim said Brian Meriwether and LaBryant King.

Defendant testified on his own behalf. He said that he had grown up in Clarksville and had a number of friends in Lincoln Homes. Defendant said he had been addicted to crack cocaine since he was fifteen years old, and he bought or was given drugs by various people in Lincoln Homes. Defendant said he suffered from paranoia when he used the drug. He said that he was smoking cocaine before the shooting and had not slept in two or three days. Defendant said that he bought and sold drugs for other people in the neighborhood, including Mr. Steele, in case the other person turned out to be an informant. Defendant said he would receive either cash or drugs as payment for his services.

Defendant said that he saw the victim, Mr. King, and Mr. Meriwether about 3:00 a.m. on the morning of the shooting. They were standing outside Mr. Lyle's girlfriend's house, and the victim was armed. Defendant said Mr. King broke one of the windows of Mr. Lyle's car and took a gun and a radio from the car. Defendant said he told several people about the incident, including Rodney Lyle, Mr. Lyle's brother. Defendant said that he kept talking about the "robbery" because he was high. Defendant said that he also told Mr. Steele that he had better watch out because he had seen the victim, Mr. King, and Mr. Meriwether come from the direction of Mr. Steele's house before they "robbed" Mr. Lyle's car.

Defendant said he was afraid that one of the three men would hear what he was saying, and either beat him up or shoot him. Defendant said he went over to Mr. Marshall's house and saw Mr. Montgomery and the victim drive up to Mr. Montgomery's house. Defendant told Mr. Marshall to get a gun, but he did not tell him why. Defendant said that he thought Mr. Montgomery had brought the victim to Lincoln Homes to find him. Defendant said that he approached the victim when the victim called out to him because he thought the victim just wanted to fight. Defendant said he did not know the victim was armed. Defendant said he was not crying, just scared, when he confronted the victim.

Defendant said the victim asked him why he was lying. Defendant saw Mr. Montgomery give a signal, and then Mr. Marshall hit the victim in the head with his gun. Mr. Marshall grabbed the victim's gun, and Defendant took the gun from Mr. Marshall. Defendant said that he followed Mr. Marshall and the victim to Mr. Steele's house because he wanted to watch the victim. Defendant said he believed that if the victim did not "get him" that day, he would do so another day. Defendant said he sat under a tree in Mr. Steele's backyard and smoked crack cocaine. After Mr. Steele hit the victim, the victim looked at Defendant and told him he was going "to get" him. Defendant said he "panicked, raised up the gun, and I shot him, and I took off running." Defendant said he had never fired a gun before.

On cross-examination, Defendant said that he followed Mr. Marshall and the victim because he wanted to make sure the victim was not released and because he was high. Defendant said he would not have shot the victim if he had not been high.

Philip Thomas was qualified as an expert in the area of alcohol and abuse counseling. He said that he met with Defendant once before trial for about one and one-half hours. Mr. Thomas said that Defendant told him he had drunk about a fifth of Seagram's Crown Royal, smoked eight or nine blunts, and smoked about fifteen rocks of cocaine prior to the incident. Defendant told Mr. Thomas he had not slept in three days.

Mr. Thomas said that someone who has heavily used drugs can have a basic understanding of what is going on around them, but cocaine generally makes the user paranoid and hyper-vigilant. A drug user would have an increased amount of fear when presented with a threat. Mr. Thomas said that when the victim looked angrily at Defendant, Defendant would have perceived the victim's demeanor as a very real threat.

On cross-examination, Mr. Thomas said that if Defendant had ingested the amount of drugs he said he did, his memory would have been impacted. He agreed that paranoiacs usually tried to avoid what they perceived as a threat. Mr. Thomas said the drugs would have impaired Defendant's judgment, but not his awareness of his circumstances. Mr. Thomas agreed that in his experience, none of his paranoiac patients actively tried to confront what they perceived to be threatening.

Reginald Lyle testified that someone broke a window in his car and stole a radio and a gun during the early morning hours of July 29, 1997. Mr. Lyle said that he heard that the victim, Mr. Meriwether, and Mr. King had "robbed" his car. He talked to the victim about the incident sometime between 10:00 a.m. and 12:00 p.m. The victim told Mr. Lyle that Defendant was lying. The victim said that if Mr. Lyle took him to Defendant, the victim "would leave him stink." Mr. Lyle interpreted this to mean that the victim would do bodily harm to Defendant, or worse.

On cross-examination, Mr. Lyle said that he told Defendant that the victim said he was lying. Mr. Lyle, however, said that he did not tell Defendant that the victim had threatened to harm Defendant if he found him.

On rebuttal, Mr. Montgomery testified that he did not see Defendant smoke cocaine before the shooting, and that no one in the group on Ms. Jenkins' front porch was using drugs. Mr. Montgomery said he had never seen Defendant ingest as many drugs as he had described to Mr. Thomas. Mr. Montgomery said that Defendant did not seem intoxicated or paranoid on the day of the shooting.

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support a finding that he was criminally responsible for the actions of Mr. Marshall, the theory under which the State proceeded at trial to support Defendant's conviction for especially aggravated kidnapping. Defendant contends that the evidence did not show that his conduct was motivated by an intent to promote or assist Mr. Marshall in kidnapping the victim. Defendant argues that although he caused the victim's death, he is, at best, guilty of a lesser included offense of felony murder.

In examining whether the evidence is sufficient to support Defendant's conviction of first degree felony murder, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of

witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

First degree felony murder, as relevant here, is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). The offense of especially aggravated kidnapping is defined as false imprisonment which is committed, as applicable here, either with a deadly weapon or under circumstances during which the victim suffers serious bodily injury. *Id*. § 39-13-305(a)(1), (4). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id*. § 39-13-302(a).

A defendant may be convicted of especially aggravated kidnapping under a theory of criminal responsibility. *See, e.g., State v. Mickens*, 123 S.W.3d 355, 391 (Tenn. Crim. App. 2003); *State v. Phillips*, 76 S.W.3d 1, 12 (Tenn. Crim. App. 2001); *see also* Tenn. Code Ann. § 39-11-401(b). Criminal responsibility is not a separate offense but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

"This Court has noted that, under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *Mickens*, 123 S.W.3d at 390. It is not necessary that the defendant take a physical part in the commission of the crime; "[m]ere encouragement of the principal will suffice." *Id*. (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)); *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). To be criminally responsible, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

Applying these principles, we conclude that the evidence is sufficient to support Defendant's conviction of especially aggravated kidnapping under a theory of criminal responsibility. Viewing the evidence in a light most favorable to the State, Defendant told several people in Lincoln Homes that the victim had broken into Reggie Lyle's car and attempted to break into Mr. Steele's house the night before. Defendant testified that he was afraid that the victim would either beat him up or shoot him when he heard what Defendant had said. Defendant went to Mr. Marshall's house where he observed Mr. Montgomery and the victim arrive at Lincoln Homes. Defendant asked Mr. Marshall to get a gun before the two men left Mr. Marshall's house.

-8-

The two men approached Ms. Jenkins' house, and the armed victim confronted Defendant. Mr. Marshall came up behind the victim, put his gun to the victim's head and struck him several times in the head. The evidence is conflicting as to whether Defendant relieved the victim of his weapon directly at that point, or whether Mr. Marshall took the victim's gun and handed it to Defendant. Nonetheless, Defendant was armed with the victim's gun as the three men walked to Mr. Steele's house. Mr. Marshall continued to carry his gun and hold onto the victim's shirt while Defendant followed a short distance behind the two men.

A crowd gathered at Mr. Steele's house after the three men arrived, so Mr. Marshall and Defendant escorted the victim into Mr. Steele's backyard. The victim sat on the back stoop, and Mr. Marshall and Defendant, still armed, positioned themselves on each side of the victim. When Mr. Steele arrived twenty or thirty minutes later, Defendant told him that Defendant and Mr. Marshall had one of the men who had attempted to break into Mr. Steele's house. Mr. Steele retrieved a gun from his car and approached the victim. He struck the victim several times in the head. The victim looked at Defendant, mumbled something, and Defendant shot him four times. Mr. Marshall said that the victim was not free to leave the backyard as they waited for Mr. Steele, and that had the victim attempted to flee, Mr. Marshall would have stopped him. Mr. Marshall said he believed that Defendant would have helped him restrain the victim had it been necessary.

Based on this evidence, we conclude that a rational trier of fact could find Defendant guilty of especially aggravated kidnapping under a theory of criminal responsibility beyond a reasonable doubt. Defendant does not dispute that he shot the victim thereby causing his death. The offense of first degree murder is defined as "a killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping[.]" Tenn. Code Ann. § 39-13-202(a)(2). Because the evidence is sufficient to support Defendant's conviction of especially aggravated kidnapping, we conclude that the evidence is sufficient to support Defendant's conviction of first degree felony murder. Defendant is not entitled to relief on this issue.

## III.  Lesser Included Offense of Facilitation

In his brief, Defendant initially argued that the trial court erred in allowing the State to proceed under a theory of criminal responsibility when the indictment did not so charge. Defendant, however, conceded in his brief that an indictment need not set forth the theories available to support a conviction of the charged offense, and he offers no argument in support of his issue. *See Lemacks*, 996 S.W.2d at 172. The issue is thus waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Nonetheless, we will address what appears to be Defendant's primary focus in this section of his brief; that is, that the trial court erred in failing to instruct the jury on facilitation as a lesser included offense of felony murder and especially aggravating kidnapping.

Essentially, Defendant contends that a facilitation instruction was warranted because the evidence could support a finding that although Defendant knew Mr. Marshall was going to kidnap the victim, Mr. Marshall and Defendant were acting under entirely different motivations. Defendant submits that Mr. Marshall's motivation was protecting Mr. Steele's interests, not Defendant's, and

Mr. Marshall neither wanted nor needed Defendant's assistance in confining the victim. Defendant, on the other hand, was afraid of personal harm if the victim was released, and he accompanied Mr. Marshall merely to see whether or not that was going to happen, and without any intention to promote or assist in Mr. Marshall's conduct.

Although at the time of Defendant's trial, a defendant was not required to request an instruction on a particular lesser included offense as a condition of raising the issue on appeal, a defendant was generally required to raise the issue in a motion for new trial if appellate review of the issue was desired. *See* Tenn. Code Ann. § 40-18-110(a)(1997); Tenn. R. App. P. 3(e). In the present case, Defendant failed to raise the lesser included offense issue in his motion for new trial, and accordingly asks this Court to review the issue under the plain error rule. *See* Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b).

Defendant relies on *State v. Utley*, 928 S.W.2d 448 (Tenn. Crim. App. 1995), in support of his argument that an instruction on facilitation was warranted for both charged offenses. In *Utley*, this Court concluded that "facilitation of felony murder does exist and that 'virtually every time one is charged with a felony by way of criminal responsibility for the conduct of another, facilitation of the felony would be a lesser included offense.'" *Id*. at 451 (quoting *State v. Lewis*, 919 S.W.2d 62, 67 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Williams*, 977 S.W.2d 101, 106 n.7 (Tenn. 1998)). Later, in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999), the supreme court established a test for determining whether a particular offense is a lesser included offense of the charged offense. We note that although Defendant's trial was conducted prior to the issuance of the supreme court's decision in *Burns*, our courts have applied *Burns* retroactively to cases which were either in the appellate "pipeline" or pending when the *Burns* decision was announced. *See, e.g.*, *State v. Stokes*, 24 S.W.3d 303, 305 (Tenn. 2000). Defendant was granted a delayed appeal which places him in the position he would have been if a notice of appeal had been timely filed. *See* Tenn. Sup. Ct. R. 28 § 9(D). Thus, the standards set forth in *Burns* are applicable because Defendant's appeal, had it been timely filed, no doubt would have been pending at the time of the court's decision.

Part (c)(1) of the *Burns* test expressly provides that "facilitation of the charged offense is a lesser-included offense of the charged offense." *State v. Ely*, 48 S.W.3d 710, 720 (Tenn. 2001); *Burns*, 6 S.W.3d at 467. In addition, facilitation of a felony is a lesser included offense of the charged felony if the defendant is charged either as jointly liable with the co-defendant as a principal, or as criminally responsible for the co-defendant's conduct. *Ely*, 48 S.W.3d at 720.

Thus, facilitation of especially aggravated kidnapping and facilitation of felony murder are clearly lesser included offenses of the charged offenses under part (c)(1) of the *Burns* test. If an offense is a lesser included offense, however, the trial court must then conduct a two-part analysis in order to determine whether the lesser included instruction should be given. *State v. Richmond*, 90 S.W.3d 648, 660 (Tenn. 2002). As explained in *Richmond*,

[f]irst, the court must determine whether any evidence exists that reasonable minds could accept as to the lesser included offense. Second, the trial court must determine if the evidence, when viewed liberally in the light most favorable to the existence of a lesser-included offense is legally sufficient to support a conviction for the lesser-included offense.

*Id.* (citing *Burns*, 6 S.W.3d at 469). "In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." *State v. Bowles*, 52 S.W.3d 69, 75 (Tenn. 2001). Secondly, the trial court must determine if the evidence is legally sufficient to support a conviction for the lesser-included offense regardless of "the theory of the State or of the defense." *Id.*; *State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002). "A defendant need not demonstrate a basis for acquittal on the greater offense to be entitled to an instruction on the lesser offense." *Allen*, 69 S.W.3d at 187.

Turning first to the charged offense of especially aggravated kidnapping, the witnesses to the victim's initial confrontation with Defendant and Mr. Marshall were substantially in agreement that Mr. Marshall guided the victim down the street to Mr. Steele's house, and that Defendant followed at some distance. Mr. Marshall testified that Defendant sat beneath a tree in Mr. Steele's backyard some distance away from the victim until Defendant responded to something the victim said. Defendant testified that he only followed the victim and Mr. Marshall to Mr. Steele's house to see if Mr. Marshall would ultimately release the victim because Defendant was afraid that the victim would personally harm him if the victim was in a position to do so. Defendant testified that Mr. Marshall stood guard over the victim while they waited for Mr. Steele's arrival and that he stayed by the tree "smoking dope" until he panicked when the victim threatened him. Viewing the evidence liberally in favor of the existence of the lesser included offense, we conclude that a jury could have concluded that Defendant facilitated the kidnapping rather than joining in the offense, and the trial court thus erred in not instructing the jury on the lesser included offense of facilitation of especially aggravated kidnapping.

The *Ely* court defined the elements of the offense of facilitation of felony murder as follows:

1.  a killing was committed in the perpetration of one of the felonies specified by Tenn. Code Ann. § 39-13-202(a)(2) or (3);

2.  the defendant knew that another person intended to commit the underlying felony, but he or she did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and

3.  the defendant furnished substantial assistance to that person in the commission of the felony; and

4.  the defendant furnished such assistance knowingly.

*Ely*, 48 S.W.3d at 719-20.

Based on the evidence supporting an instruction on facilitation of especially aggravated kidnapping, we conclude that it was also error for the trial court to fail to charge facilitation of felony murder as a lesser included offense of felony murder.

Erroneous jury instructions will result in reversal unless a reviewing court concludes "beyond a reasonable doubt that the error did not affect the outcome of the trial." *Allen*, 69 S.W.3d at 189 (citing *State v. Bowles*, 52 S.W.3d 69, 77 (Tenn. 2001)). This normally assumes that the issue is properly preserved for appellate review. However, if the issue is not preserved properly, then relief can be granted only if the error is "plain error." *State v. Terry*, 118 S.W.3d 355, 359 (Tenn. 2003). In the context of the failure to charge the jury on appropriate lesser included offenses, the erroneous instructions will not qualify as "plain error" if the error is harmless beyond a reasonable doubt. *See State v. Abel Caberra Torres*, No. M2001-01412-CCA-R3-CD, 2003 WL 21349921, at *7 (Tenn. Crim. App., at Nashville, June 10, 2003); *State v. Scott Benn*, No. E2001-01958-CCA-R3-CD, 2003 WL 934240, at *4 (Tenn. Crim. App., at Knoxville, Mar. 10, 2003), *perm. to appeal denied* (Tenn. Sept. 2, 2003); *State v. Ben Mills*, No. W1999-01175-CCA-R3-CD, 2002 WL 925260, at *6 (Tenn. Crim. App., at Jackson, May 3, 2002), *perm. to appeal denied* (Tenn. Nov. 15, 2004). Thus, because Defendant did not properly preserve this issue for purposes of appeal, relief will only be granted if the trial court's failure to instruct the jury on facilitation constituted plain error.

Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." This Court in *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), set forth the following prerequisites for finding plain error:

    a) the record must clearly establish what occurred in the trial court;
    b) a clear and unequivocal rule of law must have been breached;
    c) a substantial right of the accused must have been adversely affected;
    d) the accused did not waive the issue for tactical reasons; and
    e) consideration of the error is "necessary to do substantial justice."

*Id*. at 641-42. All five factors must be established before plain error will be recognized. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

The record contains the trial court's written instructions to the jury as well as the argument of counsel and thus establishes what occurred in the trial court. *Adkisson*, 899 S.W.2d at 641. Based on *Utley* and part (c)(1) of the *Burns* test, facilitation was clearly a lesser included offense of both felony murder and especially aggravated kidnapping. *Burns*, 6 S.W.3d at 467; *Utley*, 928 S.W.2d at 451; *Adkisson*, 889 S.W.2d at 641. A defendant's constitutional right to trial by jury is violated "when the jury is not permitted to consider *all* offenses supported by the evidence." *Ely*, 48 S.W.3d at 727 (emphasis in original). Thus, part (c) of the *Adkisson* test is met, and there is no

indication that Defendant waived the issue for tactical reasons as contemplated in (d). *Adkisson*, 889 S.W.2d at 641. This leaves us to consider whether a review of the trial court's jury instructions is "necessary to do substantial justice." *Id*. at 642.

Turning first to the charged offense of especially aggravated kidnapping, Defendant testified that he knew that the victim was going to "get [him] one way or the other" if they let the victim go. Defendant observed Mr. Montgomery and the victim arrive at Lincoln Homes while Defendant was at Mr. Marshall's house immediately before Defendant's confrontation with the victim. Defendant asked Mr. Marshall to get a gun before they went outside. Defendant armed himself with the victim's gun after Mr. Marshall initially restrained the victim in front of Ms. Jenkins' house. Defendant and Mr. Marshall stood watch over the victim for twenty or thirty minutes until Mr. Steele's arrival, and both men were armed. Defendant called out to Mr. Steele that he and Mr. Marshall had one of the men suspected of attempting to break into Mr. Steele's house. Defendant watched while Mr. Steele struck the victim several times with his gun. The victim looked at Defendant, said something threatening, and Defendant shot him. Defendant said he shot him because he was afraid the victim "was going to make a move on me or [Mr. Marshall]."

Although Mr. Marshall and Defendant ultimately might have been motivated by different goals in kidnapping the victim, this does not negate a finding that Defendant intended to promote and assist Mr. Marshall during the commission of the offense of kidnapping. Based on our review of the record, we conclude that no reasonable jury would have concluded that Defendant knowingly furnished *only* "substantial assistance" without the intent to promote or assist Mr. Marshall during the kidnapping of the victim. Defendant escorted the victim to Mr. Steele's house while armed with the victim's gun, stood guard over the victim for nearly thirty minutes, and then called out to Mr. Steele that Defendant and Mr. Marshall had the victim under guard in Mr. Steele's backyard. *See State v. Richmond*, 90 S.W.3d 648, 662 (Tenn. 2002). Thus, even if Defendant had properly preserved the issue for appeal, any error would be harmless beyond a reasonable doubt. Because the trial court's failure to instruct the jury on facilitation of especially aggravated kidnapping was harmless beyond a reasonable doubt, no substantial rights of Defendant were affected, and the error thus does not qualify as "plain."

Next, regarding the charged offense of felony murder in the perpetration of especially aggravated kidnapping, we note that Defendant was charged as a principal for the victim's murder, and Defendant does not deny that he shot the victim causing his death. Defendant's theory of defense was that he shot the victim in self-defense. Since it was harmless beyond a reasonable doubt to fail to charge facilitation of especially aggravated kidnapping, (even if Defendant had preserved the issue), and thus failure of the trial court to charge facilitation of this issue was not "plain error," then likewise it is not "plain error" for the trial court to have failed to charge facilitation of felony murder.

Accordingly, we conclude that the trial court's failure to instruct the jury on the lesser included offenses of facilitation of especially aggravated kidnapping and facilitation of felony

murder did not affect a substantial right of Defendant, and was not plain error. Defendant is not entitled to relief on this issue.

## IV. Failure to Grant a Mistrial

During its direct examination, the State asked Mr. Montgomery why the victim was upset with Defendant immediately before the victim's encounter with Defendant. Defense counsel objected to the line of questioning, and the trial court ruled the testimony admissible as to the victim's state of mind at that point in time. *See* Tenn. R. Evid. 803(3).

The State continued Mr. Montgomery's direct examination as follows:

| | |
|---|---|
| [THE STATE]: | About the trouble – was [the victim] upset with [Defendant] that day? |
| [MR. MONTGOMERY]: | Yes, ma'am. |
| [THE STATE]: | Did he tell you why he was upset with him? |
| [MR. MONTGOMERY]: | Yes, ma'am. |
| [THE STATE]: | What did he tell you? |
| [MR. MONTGOMERY]: | He said that he didn't do what they said he [had] done. |
| [THE STATE]: | Did he tell you what they said he had done? |
| [MR. MONTGOMERY]: | Yes, ma'am. |
| [THE STATE]: | What did he tell you that [they] said? |
| [MR. MONTGOMERY]: | They said he broke into somebody's car. |

. . . .

| | |
|---|---|
| [THE STATE]: | Was one of those people [Mr. Lyle]? |
| [MR. MONTGOMERY]: | Yes, ma'am. |
| [THE STATE]: | He had supposedly broke into [Mr. Lyle's] car? |
| [MR. MONTGOMERY]: | Yes, ma'am. |

-14-

| | |
|---|---|
| [THE STATE]: | Did he tell you whether or not he had talked to [Mr. Lyle] about this? |
| [MR. MONTGOMERY]: | Yes, ma'am. |
| [THE STATE]: | What was his status with [Mr. Lyle], how had they left things? |
| [MR. MONTGOMERY]: | He said that [Mr. Lyle] didn't think [the victim] would do anything like that. |

. . . .

| | |
|---|---|
| [THE STATE]: | Who did [Mr. Lyle] believe had done the break-in? |
| [DEFENSE COUNSEL]: | I am going to object to that. I don't think that's got anything to do with his state of mind as it relates to [Defendant]. |
| [THE COURT]: | I agree. I will sustain the objection, unless it becomes relevant later or something. |
| [THE STATE]: | My understanding is that the victim believed that [Defendant] was involved in the break in? |
| [DEFENSE COUNSEL]: | Your Honor, I think it's time for a jury out? |

A hearing was then conducted outside the presence of the jury. Defendant moved for a mistrial, arguing that the State's comment created an impression in the jury's mind that Defendant was responsible for the car burglary. The trial court found that any references to the victim's belief that Defendant was involved with the break-in of Mr. Lyle's car implicated Rule 404(b) concerns and sustained Defendant's objection. *See* Tenn. R. Evid. 404(b). The trial court, however, denied Defendant's motion for a mistrial. After the jury's return to the courtroom, the trial court provided the following curative instruction:

Thank you for your patience, members of the jury. [The prosecutor] is ready to proceed with cross-examination. The Court sustained an objection to her last question, and that has been stricken from the record. You are to disregard it and proceed from there, . . . .

Defendant argues that the trial court erred in not granting a mistrial as a result of the State's comment. Defendant submits that, although partially cured by Mr. Lyle's subsequent testimony, the prosecutor's unanswered question improperly left the jury with the impression that Defendant had

committed a prior criminal act. The State argues that even if the prosecutor's comment was improper, any error was sufficiently cured by the trial court's curative instruction.

It was clearly improper for the prosecutor to suggest, in the jury's presence, that the victim thought Defendant was involved in the burglary of Mr. Lyle's car. In general, evidence of a defendant's prior bad acts or crimes is not admissible to prove that the defendant committed the charged offense. Tenn. R. Evid. 404. "The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence." *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005) (citing *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994)). Although such evidence may under certain circumstances be admissible, the trial court in the case *sub judice* implicitly found by its ruling that the prejudice resulting from such evidence outweighed any probative value. *See, e.g.*, Tenn. R. Evid. 404(b)(4); *Thacker*, 164 S.W.3d at 239-40.

Having said that, we must next consider whether the trial court erred in denying Defendant's motion for a mistrial. The granting or denial of a mistrial is within the sound discretion of the trial court, and we will not disturb the court's decision absent a clear showing of abuse of discretion. *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000) (citations omitted). "A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action." *Id.* (citing *State v. Middlebrooks*, 819 S.W.2d 441 (Tenn. Crim. App. 1991)). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993).

In determining the prejudicial impact of a prosecutor's improper comment, this Court should consider the facts and circumstances of the case, any curative measures taken by the trial court, the intent of the prosecutor in making the comment, the cumulative effect of the improper comment, and the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The State's comment was brief, and there is no indication in the record that the comment was other than an impromptu remark made in response to defense counsel's objection. The general reason behind the victim's animosity toward Defendant immediately before the shooting supported Defendant's self-defense theory. Defendant, in his testimony, stated that the victim was angry at him for telling various people in Lincoln Homes that the victim had broken into Mr. Lyle's car and had attempted to break into Mr. Steele's house. No witness who testified about this subject mentioned Defendant as a possible participant in the burglary of the car. Defense counsel later asked Mr. Lyle whom the victim thought had broken into his car, and Mr. Lyle stated that the victim told him that Mr. King and Mr. Meriwether burglarized his car. Moreover, the trial court provided the jury with an instruction that they were to disregard the prosecutor's comment, and we presume that the jury followed the trial court's instruction. *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994). Under

-16-

these circumstances, and considering the relative strength of the State's case, we conclude that the trial court did not abuse its discretion when it denied Defendant's motion for a mistrial. Defendant is not entitled to relief on this issue.

## V. Jury Instructions

Defendant argues that because the State pursued a theory of criminal responsibility for the especially aggravated kidnapping conviction, the trial court erred in not providing an instruction to the jury on the "natural and probable consequences" rule.

"The [natural and probable consequences] rule underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into action." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000) (citing *State v. Carson*, 950 S.W.2d 951, 954-55 (Tenn. 1997); *Key v. State*, 563 S.W.2d 184, 186 (Tenn. 1978); *State v. Grooms*, 653 S.W.2d 271 (Tenn. Crim. App. 1983)). "The doctrine extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime." *Id*. (citing *Carson*, 950 S.W.2d at 954-55). Thus, a defendant who is criminally responsible for the target crime committed by a co-defendant may also be liable for any collateral crimes committed by the co-defendant which were the natural and probable consequences of the target crime. *See State v. Richmond*, 90 S.W.3d 648, 656-57 (Tenn. 2002); *Howard*, 30 S.W.3d at 276.

In the instant case, the State pursued a theory of criminal responsibility in supporting Defendant's conviction of especially aggravated kidnapping. Defendant's co-defendant, however, did not commit any crimes that were collateral to the kidnapping offense. Instead, Defendant was charged as a principal in the felony murder of the victim, and Defendant does not contend that he was not the shooter. Because Defendant was not charged with and held liable for the victim's death under a criminal responsibility theory, an instruction on the natural and probable consequences rule as to the offense of especially aggravated kidnapping was not required. Defendant is not entitled to relief on this issue.

## VI. Victim's State of Mind

Defendant argues that the trial court erred in excluding evidence that the victim had been convicted of a felony and sentenced to eight years, to be served in community corrections, immediately prior to his death. During a hearing out of the presence of the jury, defense counsel made an offer of proof of the victim's behavioral community corrections agreement contract which the victim executed in case No. 38508 approximately two weeks before his death. Defense counsel submitted that the agreement provided that as a condition of his community corrections sentence, the victim agreed not to possess or own a firearm. The agreement also contained a stipulation that the victim would not go onto the premises of a public housing project. Defense counsel argued at trial that although Defendant did not know about the victim's community corrections sentence, the

evidence was admissible under Rule 803(3) of the Tennessee Rules of Evidence to show the victim's state of mind at the time he confronted Defendant. Specifically, Defendant's counsel argued,

> I submit the fact that [the victim] was angry enough at [Defendant] to disregard two of the most important sentencing considerations of his eight-year contract into the community is some very probative evidence that he was, in fact, very, very mad at [Defendant] or he belonged not in Lincoln Homes nor should he have had at any point in time, wrapped his hands around a handgun. . . . I submit that the fact that [the victim] was blatantly ignoring the orders of this Court, fifteen days after being placed on community corrections[,] is very probative of how mad he was at [Defendant].

The trial court found that the proffered evidence of the victim's violation of his community corrections sentence was not relevant to Defendant's theory of self-defense because defendant did not know about the probation violations. The trial court, therefore, ruled the evidence inadmissible as not probative of a material issue at trial.

Both the trial court and the State in its brief appear to have approached this issue as one involving the admissibility of evidence of a victim's character under Rule 404(a)(2) and *State v. Ruane*, 912 S.W.2d 766 (Tenn. Crim. App. 1995). In general, character evidence to prove conduct on a particular occasion is inadmissible. Tenn. R. Evid. 404(a). As relevant to the State's argument, however, an exception exists as follows:

> (a)(2) Character of victim. Evidence of a pertinent character trait of the victim of crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

Under certain circumstances, evidence of a victim's prior violent acts may be admissible to corroborate that the victim was the initial aggressor. *See* Tenn. R. Evid. 404(a)(2). For example, when a defendant relies on a self-defense claim, specific acts of violence committed by the victim, or the victim's prior threats against the defendant, are admissible under certain circumstance to corroborate the defendant's contention that the victim was the first aggressor, even if the defendant is unaware of the prior violent acts. *See State v. Saylor*, 117 S.W.3d 239, 248-49 (Tenn. 2003); *Ruane*, 912 S.W.2d at 780. The State thus argues that the trial court properly excluded evidence of the victim's violations of his community corrections sentence because such evidence was not relevant "to any determination of the possibility that the victim was the first aggressor."

Notwithstanding the State's argument, the proffered evidence does not involve any prior violent acts or uncommunicated threats on the part of the victim against Defendant as contemplated in *Ruane* and *Saylor*. Defendant instead argued that the terms of the victim's community corrections sentence was circumstantial evidence relevant to show that the victim was so angry with Defendant that he was willing to risk revocation of his probationary status by carrying a weapon concealed in

a box when he initially confronted Defendant.  The issue thus becomes whether the trial court erred in excluding this evidence on relevancy grounds.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  "In other words, 'evidence is relevant if it helps the trier of fact resolve an issue of fact.'" *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence* §4.01[4], at 4-8 (4th ed. 2000)).

Based on our review of the record, we conclude that the victim's behavioral community corrections agreement contract was circumstantial evidence which was relevant to the victim's conduct in approaching Defendant with a weapon concealed in a box.  However, any error on the part of the trial court in this regard was harmless error.  The victim's animosity toward Defendant was described by several witnesses.  Ms. Jenkins and Mr. Montgomery testified that the victim initiated the confrontation with Defendant on the sidewalk in front of Ms. Jenkins' house, and the victim was carrying a gun concealed in some sort of box.  Mr. Montgomery testified that the victim was upset with Defendant for accusing him of offenses the victim did not commit.  Mr. Lyle testified that the victim was angry with Defendant because of the rumors, and that the victim told Mr. Lyle he would harm Defendant if the victim saw him.  Accordingly, we conclude that Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

THOMAS T. WOODALL, JUDGE